UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION


BANKINSURE, INC.                                        PLAINTIFF


VS.                            CIVIL ACTION NO. 3:11CV78TSL-MTP


PEOPLES BANK OF THE SOUTH
F/K/A PEOPLES BANK OF FRANKLIN COUNTY                   DEFENDANT

<u>MEMORANDUM OPINION AND ORDER</u>

This cause is before the court on plaintiff BancInsure, Inc's motion for declaratory judgment (which is in substance a motion for summary judgment on BancInsure's complaint for declaratory judgment and will be treated as such), and on a motion for partial summary judgment filed by defendant Peoples Bank of the South f/k/a Peoples Bank of Franklin County (the Bank).  These motions have been fully briefed and the court, having considered the memoranda of authorities, together with attachments submitted by the parties, concludes that the parties' respective  motions should be granted in part and denied in part, as set forth herein.

At issue in this case, *inter alia*, is whether a Financial Institution Bond (Bond) issued by BancInsure to the Bank provides coverage for losses alleged to have been suffered by the Bank as a result of certain dishonest and/or fraudulent conduct of bank employee Alex Corban.  In April 2009, during the period covered by

the Bond,[1] the Bank became aware that Corban, an executive vice-president, had conducted multiple fraudulent transactions whereby he forged signatures, made unauthorized withdrawals, and released collateral without authority to do so.[2]  The Bank made a claim under the Bond for losses allegedly resulting from Corban's dishonest and fraudulent conduct.  BancInsure denied the claim, and filed the present action seeking a declaratory judgment on six specific issues:

> 1.  Whether exclusion (e) excludes coverage under Insuring Agreement (B);
>
> 2.  Whether exclusion (h) excludes coverage under Insuring Agreement (B);
>
> 3.  Whether the Bond is a statutory bond under Mississippi Code Annotated § 81-5-15;
>
> 4.  Whether the financial benefit requirement under Insuring Agreement (A) of the Bond will be enforced as written;
>
> 5.  Whether the loans in question are considered "loans" under the Bond;
>
> 6. Whether interest income is recoverable under the Bond.

_____

[1]     The Bank obtained the Bond from BancInsure on June 1, 2005, and coverage remained in effect until June 1, 2011.

[2]     On August 20, 2010, Corban pled guilty to violations of 18 U.S.C. § 656, which covers theft, embezzlement or willful misapplication of bank funds by a bank officer or employee.

The parties have filed competing summary judgment motions as to each of these issues, which the court addresses in turn.[3]

Issues 1 & 2:

The Bank asserts that coverage for its losses is provided by Insuring Agreements (A) and (B) under the Bond.  In the court's opinion, since the Bank's losses are alleged to have been caused by an employee, exclusion (h) of the Bond excludes coverage under Insuring Agreement (B).

Insuring Agreement (B) covers the following:

(B)(1) Loss of Property resulting directly from
(a) robbery, burglary, misplacement, mysterious unexplainable disappearance and damage or destruction of the Property or
(b) theft, false pretenses, or common-law or statutory larceny, committed by a person present in an office or on the premises of the Insured,
while the Property is lodged or deposited within offices or premises located anywhere.

Exclusion (h) excludes coverage for

loss caused by an employee, except when covered under Insuring Agreement (A) or when covered under Insuring Agreement (B), (C) or (R) and resulting directly from misplacement, mysterious unexplainable disappearance or destruction of or damage to Property.

BancInsure argues that since the loss at issue is alleged to have resulted from theft, and not from misplacement, mysterious unexplainable disappearance or destruction of or damage to

---

[3]     The Bank filed a counterclaim for bad faith breach of contract, which is the subject of a separate motion by BancInsure for partial summary judgment.  The briefing on that motion is incomplete at this time.

3

property, then exclusion (h) bars any coverage under Insuring
Agreement (B).  The Bank, on the other hand, argues that the
phrase "and resulting directly from misplacement, mysterious
unexplainable disappearance or destruction of or damage to
Property" in exclusion (h) only modifies "Insuring Agreement ...
(R)" and that exclusion (h) therefore does not bar coverage under
Insuring Agreement (B) for losses caused by theft.  In the court's
opinion, exclusion (h) unambiguously excludes coverage under
Insuring Agreement (B) for loss caused by an employee unless the
loss is caused by the "misplacement, mysterious unexplainable
disappearance or destruction of or damage to Property."

     Further, to the extent of any loss claimed by the Bank
resulting from a loan, extension of credit or transaction
involving the Bank as a lender, exclusion (e) forecloses coverage
under Insuring Agreement (B).  Exclusion (e) bars coverage for:

> loss resulting directly or indirectly from the complete
> or partial non-payment of, or default upon, any Loan or
> transaction involving the Insured as a lender or
> borrower, or extension of credit ... whether such Loan,
> transaction or extension was procured in good faith or
> through trick, artifice, fraud or false pretenses,
> except when covered under Insuring Agreement (A), (D),
> (E), (P) or (Q).[4]

Thus, whether there is coverage for the Bank's losses from
Corban's misdeeds hinges on Insuring Agreement (A).

---

     [4]   The Bank does not assert that there is coverage under
Insuring Agreements (D), (E), (P) or (Q).

Issues 3 & 4:

Insuring Agreement (A) of the Bond provides fidelity coverage, protecting the insured against losses resulting from certain dishonest and fraudulent acts of its officers and employees.  By its terms, Insuring Agreement (A) provides indemnification for:

> (A) Loss resulting directly from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others.
>
> Such dishonest or fraudulent acts must be committed by the Employee with the manifest intent:
> (a) to cause the Insured to sustain such loss, or
> (b) to obtain improper financial benefit for the Employee or another person or entity.
>
> However, if some or all of the Insured's loss results directly or indirectly from Loans, that portion of the loss is not covered unless the Employee was in collusion with one or more parties to the transactions and has received, in connection with these transactions, an improper financial benefit.
>
> As used throughout this Insuring Agreement, financial benefit does not include any employee benefits earned in the normal course of employment, including salaries, commissions, fees, bonuses, promotions, awards, profit sharing or pensions.

The Bank acknowledges that Insuring Agreement (A), *as written*, limits covered losses resulting from fraudulent or dishonest acts of employees to losses caused by the employee with the manifest intent to cause the Bank to sustain loss or to obtain improper financial benefit for the employee or another person or entity. Also, and more pertinently, in the case of "loan" losses, Insuring

Agreement (A), *as written*, provides no coverage *unless* there is proof of collusion between the employee and one or more parties to the transaction *and* the employee received an improper financial benefit in connection with the transaction.  However, the Bank argues that these additional requirements for coverage are unenforceable as a matter of law since the Bond is the statutory bond required by Mississippi Code Annotated § 81-5-15, and since the coverage limitations conflict with the coverage requirements of the statute.

Mississippi Code Annotated § 81-5-15 requires a fidelity bond for officers and employees of banks.  The statute states:

> Every active officer and employee of any bank or trust company in this state shall furnish a fidelity bond to the bank by which he is employed for the faithful performance of his duties, executed by some surety company authorized to do business in the State of Mississippi, as surety.  The conditions of such bond, whether the instrument so describes the conditions or not, shall be that the principal shall protect the obligee against any loss or liability that the obligee may suffer or incur by reason of the acts of dishonesty of the principal or by reason of the violation of any of the provisions of the banking laws of Mississippi.  The amount of such bond shall be fixed by the board of directors, subject, however, to approval of the state comptroller and the same shall be inspected upon the examination of the bank or trust company.

The Bank asserts that since § 81-5-15 requires that a fidelity bond be issued for officers and employees of banks, then a fidelity bond issued for such coverage is considered a statutory bond under the law, see Kansas Bankers Sur. Co. v. Farmers State

Bank, 408 F. Supp. 2d 751, 754-55 (S.D. Iowa 2005) ("if a bond is of a type required by statute the general rule is that "[i]t is presumed that the intention of the parties was to execute such a bond as the law required."); and it argues that since the statute requires that such fidelity bond provide coverage for "any loss or liability" suffered as a result of the employee's acts of dishonesty, "regardless of whether the instrument so describes the conditions or not," then the requirement in the BancInsure Bond that the Bank must prove that a dishonest or fraudulent employee acted with manifest intent to cause a loss or obtain an improper financial benefit, and in the case of a loan loss to also prove collusion and receipt of an improper financial benefit, conflict with the requirements of the statute and must be stricken as surplusage, see American Cas. Co. of Reading, Penn. v. Irvin, 426 F.2d 647, 650 (5th Cir. 1970) ("if a statutory bond contains provisions which do not comply with the requirements of the law, they may be eliminated as surplusage and denied legal effect"); .

There are no Mississippi cases interpreting the subject statute and operative Bond language, and the parties vigorously dispute whether the Bond is a statutory bond.  BancInsure notes that a simple comparison of the requirements of the statute and the terms of the Bond and circumstances of its acquisition, confirms the Bond was not intended to be a statutory bond.  For example, whereas the statute requires that the bank employee

7

"shall furnish a fidelity bond," the BancInsure Bond was procured *by the Bank*, and not by Corban; and while the statute requires that a bank employee agree, as principal, to protect the Bank from losses with the surety's obligation being secondary to that of the employee, the Bond neither names Bank employees as principals nor treats them as such.  BancInsure also points out that there is otherwise no evidence to show that the Bank complied with the statutory provisions requiring approval by the State Comptroller and inspection by state authorities on examination of the Bank.

The Bank, however, notes that bonds obtained under comparable statutes have, in fact, been found to be statutory bonds.  See, e.g., First Dakota Nat'l Bank v. St. Paul Fire & Marine Ins. Co., 2 F.3d 801 (8th Cir. 1993); First American State Bank v. Continental Ins. Co., 897 F.2d 319 (8th Cir. 1990); Kansas Bankers, 408 F. Supp. 2d 741.  Indeed, in Kansas Bankers, the court held the identical bond was a statutory bond notwithstanding that it was obtained by the bank, and not by the employee.  In addition, the Bank has submitted an affidavit from Bank President Larry Hill, who states that the Bank purchased the Bond "in fulfillment of the statutory requirements of ... § 81-5-15...."

It is ultimately unnecessary to determine whether the subject Bond is a statutory bond required by § 81-5-15, since in the court's opinion, even assuming that is the case, the terms of the Bond may be enforced as written, as they are not inconsistent with

the underlying purpose of § 81-5-15.  This is precisely what the Eighth Circuit held in First Dakota, *supra*, when considering the validity of the proof requirements under Insuring Agreement (A) of a nearly identical Financial Institution Bond.  In First Dakota, a South Dakota statute similar to Mississippi's § 81-5-15 required that bank officers and employees furnish fidelity bonds which "shall provide for indemnity to such bank on account of any losses sustained by it as a result of any dishonest, fraudulent, or criminal act or omission committed or omitted by them...."  S.D. Codified Laws Ann. § 51-17-36 (1987).   The district court held that the Financial Institution Bond issued by the defendant to the plaintiff bank was a statutory bond.  Notwithstanding this, the Eighth Circuit concluded that "the fidelity bond's additional requirements of manifest intent and of the $2,500 benefit [were] legally enforceable under South Dakota law."  2 F.3d at 808.  The court reasoned,

> First, the South Dakota Director of Banking and Finance approved St. Paul's fidelity bond as written.  See St. Paul's app. at 82 (bond approval).  Second, these two additional requirements under the fidelity bond are not inconsistent with the underlying purpose of § 51-17-36. Consequently, we conclude that the district court correctly required First Dakota to prove that a dishonest or fraudulent employee acted with manifest intent to cause a loss and to obtain at least a $2,500 benefit when the loss results from a loan.

Id.

Like the South Dakota statute (and the Mississippi statute), the Iowa statute under consideration in Kansas Bankers, *supra*, required that officers and employees of the bank enter into a bond "indemnifying the bank against losses resulting from any act or acts of fraud [or] dishonesty ... committed by such officer...." 408 F. Supp. 2d at 754-55. Further, the court found there was "no material distinction to be made between the South Dakota and Iowa statutes with respect to the financial benefit issues." 408 F. Supp. 2d at 756. Since the bond in Kansas Bankers had presumably been approved by the Iowa Insurance Commissioner for sale to financial institutions in the state, the court held that in accordance with the reasoning in First Dakota, it would give effect to the financial benefit limitation in the case of loan losses. Id.[5]

The Bank readily acknowledges that the Mississippi Department of Banking and Consumer Finance reviewed the Bond during the bank examination process, and that it implicitly approved the Bond. However, it attempts to distinguish First Dakota and Kansas Bankers on the basis that the statutory language involved in those

---

[5]     The court in Kansas Bankers did find the collusion requirement to be inconsistent with the Iowa statute, because the statute expressly the statute expressly provided for indemnification of losses for unlawful acts committed by the employee directly or through collusion. Kansas Bankers Sur. Co. v. Farmers State Bank, 408 F. Supp. 2d 751, 756 n.1 (S.D. Iowa 2005). The Mississippi statute says nothing about collusion.

cases is not the same as that in the Mississippi statute.  In the court's opinion, however, while there are obviously variations in the language of the three statutes, the import of the pertinent statutory language in all three statutes is effectively the same, requiring coverage of "any losses," in the case of the Mississippi and South Dakota statutes, and in the Iowa statute, of "losses resulting from any act or acts of fraud [or] dishonesty."

Based on the foregoing, the court concludes that in order to recover under Insuring Agreement (A) of the Bond, the Bank is required to show that its claimed losses resulted directly from Corban's dishonest or fraudulent acts; were committed by Corban with the manifest intent either to cause the Bank to sustain such loss, or to obtain an improper financial benefit for himself or for another; and in the case of any loss resulting directly or indirectly from "loans," that Corban was in collusion with one or more parties to the transactions and received an improper financial benefit in connection with the transactions.

Issue 5:

BancInsure denied coverage for each of the Bank's claimed losses (with one exception) on the basis that the losses were the result of loans, and the Bank had not shown that Corban was either in collusion with one or more parties to the transactions or that he had received an improper financial benefit.  BancInsure filed its motion for declaratory judgment/summary judgment seeking a

11

ruling by the court that *all* of the losses claimed by the Bank,
involving eight different Bank customers, are loan losses, which
are recoverable, if at all, only if the Bank proves that Corban
acted in collusion with one or more parties to the transactions
and that he received an improper financial benefit in connection
with the transaction.  In response, and in its motion for partial
summary judgment, the Bank advises it does not dispute that the
losses relating to four of the customers, James Wallace, William
Lampton, Sr., William Lampton, Jr. and Chuck Magee, involve loans;
but it argues that the transactions involving the other four
customers – Joe Hargett, Steve Parker, Carl Mark Smith and Tillmon
Bishop – were not "loans" under the terms of the Bond.  While the
parties do not agree on the proper characterization of these
latter transactions, for purposes of the present motions, they do
not dispute the basic circumstances of the following transactions:

Joe Hargett:

After receiving a maturity notice from the Bank in connection
with a $32,000 loan, Bank customer Joe Hargett contacted the Bank
and stated he had never borrowed money from the Bank.  Vice
President Frank Foster researched the matter and discovered that
Hargett's signature on the loan documents did not match his
signature on a CD he had with the Bank, which was pledged as
collateral for the loan by an apparently forged pledge document.

When contacted about the putative loan which he originated, Corban claimed that Hargett had borrowed the money to purchase a car for his son.  Corban told Foster he would contact Hargett about the loan and report back.  When Foster subsequently contacted Hargett, Hargett reported that Corban had called him and told him that he, Corban, would pay off the loan.  Hargett signed an affidavit of forgery against Corban.

Although the proceeds of this putative "loan" to Hargett were disbursed to BrookLin Moulding, owned by Jamie Wallace, Corban's former employer, Wallace told the Bank he had no knowledge of Corban's actions.  The Bank claims a loss of $33,521.79, including interest.

Steve Parker:

When confronted about other forged loan documents, Corban admitted he forged Steve Parker's signature on loan documents for a $38,050 loan and secured the loan with a CD owned by Parker. Parker confirmed that the signatures on the documents in connection with the putative loan were forgeries.  Parker reported he knew of Corban's actions relative to this alleged loan, though he did not know that his CD had been pledged as collateral.  He explained that he did not say anything about it on account of his friendship with Corban and was going to give Corban time to pay off the loan on his own (which did not occur).  The proceeds were paid to James Wallace, who owned BrookLin Moulding, Corban's

13

subsequent employer.  The Bank claims a loss of $39,858.68,
including interest.

<u>Carl Mark Smith</u>:

A "loan" to Carl Mark Smith came to the Bank's attention in a review of past due loans.  A review of the loan documents revealed an apparent irregularity in the signatures on the loan documents and a CD assignment by Smith.  Upon being contacted, Smith reported he had no loans with the Bank; and upon reviewing the loan documents, Smith confirmed that the signature on the documents was a forgery.  Smith signed a forgery affidavit against Corban.

The Bank's investigation ultimately revealed that Corban had used the funds from the Smith "loan" to pay off a loan for another Bank customer, Danny McKey.  According to the Bank, McKey had originally taken out a $61,000 loan which was secured by certain real property.  In 2003, McKey fell behind on the payments when his wife became ill.  Corban told the Bank he had taken steps to foreclose on the property, but in fact, he did not foreclose on the property.  Instead, he created two fictitious loan transactions (in the names of David Fields and Tom Monroe) to give the appearance of a foreclosure, purporting to sell the property to Fields and Monroe for $21,675 and $40,000, respectively.  The funds disbursed on these two "loans" was used to pay off McKey's

loan.  The Smith loan, in turn, in the amount of $23,000, was made to pay off the "loan" to Fields.[6]

When the Bank finally managed to unravel and decipher Corban's activities in connection with these various accounts, it contacted Danny McKey to determine whether his loan was a legitimate loan to begin with (the Bank was uncertain whether this was another fraudulent "loan" that had been concocted by Corban), and whether in fact, he still owned the property (which Corban had represented to the Bank had been foreclosed).  McKey acknowledged that it was a legitimate loan and that he still owned the property, so the Bank, which still had a good deed of trust on McKey's property and thus could have foreclosed, reworked McKey's loan and applied the proceeds to the Smith, Lampton and McNeil accounts.  As explained by Bank President Larry Hill, "We ended up making a $75,000 loan to Danny McKey; ... [W]e applied $20,000 against the charge-off loan of Will Lampton.  We applied $20,000 against the charge-off loan of Joseph McNeil, and we, on our

---

[6]     BancInsure originally moved for summary judgment on the Bank's claim for recovery of its alleged losses resulting from Corban's actions in connection with a putative "loan" to Carl Mark Smith on the basis that this constituted a "loan" under the terms of the Bond.  Following discovery, BancInsure filed an amended and/or supplemental memorandum in support of its motion for summary judgment, arguing that in light of what it learned in discovery relating to the Smith transaction, it is no longer relevant whether the Smith "loan" was or was not a "loan" under the Bond, since the undisputed facts establish that the Bank did not sustain a loss in connection with the putative Smith "loan" transaction.  The court addresses this new argument, *infra* p. 20-22.

books, book a recovered to Carl Mark Smith, charge-off."  McKey is currently paying the reworked loan.

<u>Tillmon Bishop:</u>

After receiving notices from the Bank relating to a loan he supposedly had with the Bank for around $3,000, Tillmon Bishop contacted Corban multiple times and was told he was receiving these notices due to a posting error.  Eventually, in investigating Corban's activities, the Bank located a check dated December 17, 2002 for $2,900 made payable to Bishop.  Bishop signed an affidavit of forgery against Corban relating to this putative loan, and he denies that he ever signed loan documents for the  supposed loan, that he endorsed the $2,900 check or that he received the proceeds of the check.  The Bank believes that Corban must have forged Tillmon's signature, cashed the check and pocketed the money.[7]  The Bank claims a loss of $3,920.05, including interest.

The Bond defines the term "loan" to mean "all extensions of credit by the Insured and all transactions creating a creditor relationship in favor of the insured and all transactions by which the insured assumes an existing creditor relationship."  The parties agree that without an extension of credit, there is no

---

[7]     Upon investigation, the Bank also discovered that Corban had forged Bishop's mother's signature on a CD that was pledged as security for a $28,000 loan to Bishop, and had done so without Bishop or his mother's knowledge.  The Bank does not claim a loss in connection with this transaction.

loan under the Bond.  However, they disagree as to whether there was an extension of credit.  BancInsure declares that each of these disputed transactions involved an extension of credit, so that the Bank's claimed losses are "loan" losses.  The Bank contends that credit was not actually extended to any of the individuals whose identities were fraudulently used by Corban and therefore, the losses from these fraudulent transactions were not "loan" losses.  Having considered the parties' arguments, the court concludes that these transactions were not "loans" under the Bond as they were not actual loans but rather fictitious transactions contrived by Corban to conceal his theft.

In support of its position that the transactions at issue were "loans" under the Bond, BancInsure notes that courts have broadly interpreted the Bond's definition of "loan" to include not only transactions traditionally considered loans by banks, but also other transactions that involve extensions of credit.  See, e.g., Humboldt Bank v. Gulf Ins. Co., 323 F. Supp. 2d 1027, 1033 (N.D. Cal. 2004) (finding that funds supplied to a servicing contractor for use in ATMs to be an "extension of credit"); Calcasieu-Marine Nat'l Bank of Lake Charles v. American Emp. Ins. Co., 533 F.2d 290, 298 (5th Cir. 1976) (holding that loan loss exclusion applied to de facto loans); Resolution Trust Corp. v. Aetna Cas. & Sur. Co., 25 F.3d 570, 579 (7th Cir. 1994) (finding that transactions "in the nature of a loan" were excluded);

18

Affiliated Bank/Morton Grove v. Hartford Acc. & Indem. Co., No. 91-C-4446, 1992 WL 91761, at 5 (N.D. Ill. Apr. 23, 1992) (N.D. Ill. Apr. 22, 1992) (treating overdrafts as loans). Yet while it asserts the transactions at issue involved an extension of credit, it fails to explain how that is so.

In Calcasieu-Marine National Bank, cited by BancInsure, the Fifth Circuit held that in order to qualify as a "loan" under the loan loss exclusion at issue there, it was not necessary that the loan be a "formal loan" in which "the lender [sic] comes into the bank, negotiates with the loan department, signs a promissory note and receives from the bank money which must be repaid at interest"; instead, the term "loan" would include a "de facto" loan in which, regardless of form, a sum of money is delivered to another and the latter agrees to return at a future time an equivalent sum to that which he borrowed. 533 F.2d at 296. However, the court made clear that a loan, whether formal or de facto, will be found only where there is an agreement by which, in substance, one party transfers to the other a sum of money which that other agrees to repay, with or without interest. Id. (citations omitted). See also id. (Stating that "whether or not (a) transaction constitutes a loan, is to be determined from the surrounding facts in the particular case") 533 F.2d 290, 296 (5th Cir. 1976) (citation omitted).

19

Here, it is undisputed that neither Hargett, Parker, Smith nor Bishop did not borrow the money from the Bank represented by the putative loans; they did not receive the funds and they did not agree to repay the putative debt.  On the contrary, they were unaware of any of these transactions until after the fact.  While fraudulent loan documents generated by Corban gave the appearance that credit had been extended to these individuals, this was a false impression.  Credit was not extended to any of the individuals whose identities were fraudulently used by Corban to facilitate his scheme, nor was credit extended to any other individual or entity who may have received putative "loan" proceeds from Corban, since there was never any agreement by anyone to repay the proceeds of the faked "loans".[8]  For these reasons, the court concludes that the Hargett, Smith, Bishop and Parker losses were not "loan" losses under the terms of the Bond.

Issue 6:

In prior litigation between the same parties involving the same Bond, this court ruled that the Bank's claim for accrued

---

[8]     The court notes that it finds no significance in the fact that in its communications with BancInsure, the Bank referred to the transactions as "loans."
    Further, the court's conclusion that these were not "loans" is made without reference to the testimony of BancInsure's 39(b)(6) designee Van Butler, and is also made without regard to the opinions of the parties' experts, including BancInsure's expert (who agreed that there was "not a valid credit relationship" and "no extension of credit ... given to these individuals").

interest was excluded as "potential income" under exclusion (s),

which excludes coverage for:

> potential income, including but not limited to interest
> and dividends, not realized by the Insured (including
> for purposes of this exclusion portions of outstanding
> promissory notes payable to the Insured which represent
> payments of interest, fees and penalties in connection
> with prior promissory notes payable to the Insured).

Peoples Bank of the South v. BancInsure, Inc., Civ. Action No.

3:09CV217TSL-MTP (S.D. Miss. July 7, 2011).  The court's ruling

resolves the issue whether interest income is recoverable under

the Bond: It is not.

### BancInsure's Supplemental Memorandum

BancInsure has filed a supplemental memorandum in support of

its motion for declaratory judgment/summary judgment to address

new information learned through discovery which it submits creates

additional bases for its motion relating to certain of the

transactions.  Specifically, BancInsure argues as follows:

With respect to the Tillmon Bishop loan, BancInsure notes

that in the deposition of Larry Hill, the Bank's Rule 30(b)(6)

designee, Hill speculated that Corban forged Bishop's signature

and pocketed the money from the $2,900 loan, but he admitted he

had no knowledge of Corban being in collusion with anyone to

create the loan transaction.  Based on this testimony, BancInsure

argues that since the Bank has no proof of collusion, then its

denial of coverage of the Bishop loan must stand.  However, as the

court has concluded that the Bishop transaction was not a "loan," the Bank is not required to prove collusion to recover under the Bond.

BancInsure next states that while it originally sought declaratory judgment as to the Carl Mark Smith transaction on the basis that the claimed loss was a loan loss, it now argues that it is no longer relevant whether or not this was a "loan" under the Bond since the evidence establishes as a matter of law that the Bank did not suffer a loss with respect to this transaction. Based on the undisputed facts relating to this transaction, the court finds merit in BancInsure's position.

The facts pertinent to the Smith transaction, set forth *supra* at 13–14, are that Danny McKey had an original legitimate loan of $61,500 which he failed to pay; that Corban created fictitious loans from other customers and used the proceeds to pay off McKey's loan; that he used other fictitious loans (including the fictitious Smith loan) to pay off those fictitious loans; and that ultimately, the Bank, upon discovering Corban's fraudulent activities, created a new, legitimate loan to McKey, which was used to pay off the outstanding fictitious loans generated by Corban.  And McKey, who was originally legitimately indebted to the Bank (and who was apparently unaware his original loan had been paid off), remains legitimately indebted to the Bank, albeit on the basis of new loan documents.  He is paying on a loan, which

was a legitimate loan to begin with.  While the Bank claims
otherwise, it is clear to the court that Corban merely shifted
money around on the Bank's books, with the result that there was
only a bookkeeping or theoretical loss, which is not a loss
covered under the terms of the Bond.  See F.D.I.C. v. United
Pacific Ins. Co., 20 F.3d 1070, 1080 (10th Cir. 1994) (holding that
"[b]ookkeeping or theoretical losses, not accompanied by actual
withdrawals of cash or other such pecuniary loss is not
recoverable.").

Finally, BancInsure argues that the Bank is precluded from
recovering on loans to William Lampton, Jr. and William Lampton,
Sr. on the basis that by entering a Workout Agreement with the
Lamptons by which it agreed to forgive their loans, without notice
to or agreement by BancInsure, the Bank violated the requirements
of Section 7 of the Bond, which provides:

>     (b) In the event of payment under this Bond, the Company
>     shall be subrogated to all of the Insured's rights of
>     recovery thereunder against any person or entity to the
>     extent of such payment ...
>     (e) ... The insured shall do nothing after discovery of
>     loss to prejudice such rights or cause of action.

BancInsure submits that the Bank, in entering the Workout
Agreement, has prejudiced its subrogation rights and is thus
precluded from recovering the alleged losses relating to the
Lampton loans.[9]  It contends, alternatively, that the Bank is not

_____

> [9]    The facts relating to the Lampton loans are as follows:
> In December 2003, Corban originated a line of credit for

entitled to recover under the Bond for either of the Lampton loans
because there is no proof that Corban acted in collusion with any
party to the transaction or that he received an improper financial
benefit in connection with the transaction.  As to the latter
position, the Bank has pointed to evidence of collusion and
improper financial benefit.  As to the Workout Agreement, the
court is unable to conclude on the present record that the Bank's
claim is necessarily foreclosed and considers that a fuller
development of the facts will facilitate a decision on this issue.
Therefore, the court at this time will deny BancInsure's motion
for a ruling that the fact of the Workout Agreement precludes the
Bank's claim.

---

Lampton, Jr., secured by certain real property.  After he sold the
real property in 2006, Lampton, Jr. paid $54,743.43 on the line of
credit, leaving a balance of $20,025.82.  He then drew additional
funds from the line of credit, increasing the balance to
$55,425.82.  Corban then originated a loan to Lampton, Jr. of
$55,425.82, to pay off the line of credit.  The loan was secured
by a deed of trust on the real property which Lampton, Jr. had
sold in 2006.  The Bank discovered there was no collateral for the
loan in January 2010, when the closing attorney on Lampton, Jr.'s
sale of the property contacted the Bank requesting cancellation of
the deed of trust.  The Bank claimed it suffered a loss of
$49,421.14 in connection with the Lampton, Jr. Loan.
      Lampton, Sr. obtained a $181,025 loan from the Bank secured
by certain real property which was owned jointly by Bill Lampton
and his wife Kay.  The Bank later learned that Mrs. Lampton's
signature on the loan documents had been forged.  Corban cancelled
the deed of trust, without authorization from the Bank; and when
questioned about his actions, he informed the Bank that he had
filed a new deed of trust with just Mr. Lampton's one-half
interest in the property secured.  Following Corban's resignation,
the Bank discovered that no new deed of trust had been recorded
and that there no collateral for the loan.

24

<u>Conclusion</u>

Based on the foregoing, it is ordered that the parties'
respective motions are granted in part and denied in part, as set
forth herein.

SO ORDERED this 30th day of March, 2012.


/s/ Tom S. Lee
UNITED STATES DISTRICT JUDGE